**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 02 CR 729 |
| v. ) | |
| ) | |
| MARIA MIRANDA, ) | HONORABLE DAVID H. COAR |
| ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Maria Miranda ("Miranda" or "Defendant") was convicted of conspiracy and drug-trafficking. Afterward, she filed a motion for a new trial based on newly discovered evidence (Doc. No. 251). On April 18, 2007, an evidentiary hearing was held before this Court on this motion. Defendant's evidence consisted entirely of the testimony of Dr. Gardner, who was retained by Defendant to administer psychological assessment tests to Miranda for post-trial sentencing purposes. During these psychological evaluations, which included six hours of clinical interviews, the administration of the Minnesota Multiphasic Personality Inventory ("MMPI-2"), and an interview with a collateral source, Dr. Gardner came to the conclusion that Miranda is "pathologically naïve," has "impaired logic," and exhibits a psychological age equivalent to a twelve year old. Dr. Gardner based these conclusions on the scaled scores from Miranda's personality test as compared with anecdotal evidence from her life history and observations of Miranda during her interviews. After reviewing Defendant's arguments for reconsideration and the newly discovered evidence, Defendant's motion is DENIED.

1. **GOVERNMENT'S POSITION**

The Government's main argument is that Dr. Gardner's testimony is an insufficient basis on which to grant a new trial because her testimony would be inadmissible under the *Daubert* standards and her central conclusion of "remarkable" naïvete was ultimately withdrawn. The Government claims that Dr. Gardner's testimony is unreliable because, *inter alia*, it did not contain a valid, scientifically recognized diagnosis and her conclusions were based on inadequate data and derived from procedures not following standard protocol. Specifically, the Government argues that Dr. Gardner did not sufficiently corroborate Miranda's story with third parties and she never conducted a test to specifically measure Miranda's cognitive capacity before determining that she suffered from impaired logic and judgment. The Government also contends that Dr. Gardner's administration of the MMPI-2 was flawed and that her failure to give due consideration to evidence of Miranda's dishonesty in interpreting her psychological profile undermines the reliability of Dr. Gardner's conclusions. This is because some of Miranda's stories of her childhood formed the foundation of Dr. Gardner's judgment that her early experiences with poverty and men caused her naïvete. The Government points out that Dr. Gardner admitted during the hearing to several points regarding accepted professional practices that cast doubt on the credibility of her own findings and that the contradictory and ambiguous nature of the anecdotal support for her diagnosis is too subjective to be persuasive on the issue. For these reasons, the Government argues that the ostrich instruction was appropriate and that the Seventh Circuit's recent affirmation of Miranda's conviction should stand without grant of a new trial.

## 2. DEFENDANT'S POSITION

Defendant argues that Dr. Gardner's testimony demonstrates Miranda is incapable of the behaviors necessary to satisfy the requisite "deliberate avoidance" standard of knowledge that was the basis of her original conviction. At her criminal trial, this Court issued an ostrich instruction, which permits a jury to convict if, given what the Defendant knew, they could infer that Miranda knew enough to suspect involvement in criminal activity but deliberately avoided discovering the truth. Defendant contends that Dr. Gardner's testimony is evidence that Miranda's "remarkable" naïvete prevented her from second-guessing the motives of her co-conspirators because she is not equipped to do the intuitive questioning that would lead others to be appropriately suspicious under similar circumstances. They assert that these naïve predispositions make it unlikely that Miranda was *deliberately* avoiding knowledge, but instead was genuinely unaware of her co-conspirators' plans. If the ostrich instruction was inappropriate, Defendant argues that the Government would have had to meet a higher burden at trial to show that Miranda had actual knowledge beyond a reasonable doubt and in light of Dr. Gardner's new evidence this would be difficult to demonstrate. For these reasons, Defendant argues that the new evidence would probably lead to Miranda's acquittal if a new trial was granted.

In responding to the Government's claims that Dr. Gardner's testimony would be inadmissible under the *Daubert* standards, Defendant submits that her testimony was based on tests and methodologies generally accepted in the field of psychology. Even though there are other tests or protocols that *could* have been used, Defendant contends that this does not undermine the reliability of the methods that Dr. Gardner *did* choose in this instance. While

Defendant admits that further psychological testing is possible and would be helpful in confirming Dr. Gardner's initial findings, the potential for more extensive exams does not cast doubt on Dr. Gardner's current opinions. Defendant asserts that Dr. Gardner's testimony is enough to infer that Miranda could convincingly demonstrate at a new trial that her psychological limitations precluded the possibility of her having the requisite *mens rea* to support a conviction of conspiracy, thus leading to a probable acquittal.

**3.     SUMMARY OF GARDNER'S TESTIMONY**

• Dr. Gardner met with Miranda on two occasions in October 2003 and has not seen or evaluated her since that time. (*Maria Miranda* Hr'g Tr. 40, April 18, 2007.) The results of the MMPI-2 test are reliable only to a certain degree over time, which may mean that the results garnered in 2003 did not perfectly reflect Miranda's profile at the time of the crime in 2002. (Tr. at 107.)

• The questionnaire for the clinical interview did not come from a standard diagnostic assessment but was composed of questions that Dr. Gardner generated herself. (Tr. at 43-44.)

• The results of Miranda's MMPI-2 yielded elevated scores on the "L scale," which measures the degree to which the client is lying, the schizophrenia scale, which suggests logic impairment, and the paranoia scale, which measures suspiciousness. (Tr. at 25, 29, 100.)

• The validity indicators on the MMPI-2 showed that Miranda was giving reasonable information in response to the questions asked and the indices were not high enough to invalidate Miranda's test results. (Tr. at 73.)

• Dr. Gardner characterized her interpretation of her clinical evaluations of Miranda as a "mosaic" approach, arrived at by construing Miranda's test results in light of her life history and personal observations and clarified by the use of professional diagnostic manuals. (Tr. at 12-15.) Aside from the one interview conducted with Ms. Segura, Dr. Gardner did not, however, consult multiple outside sources as is recommended to corroborate the information that Miranda provided her. (Tr. at 76.)

• Dr. Gardner concluded that Miranda has impaired logic and that she is remarkably naïve, unsophisticated and concrete/literal in her thinking. (Tr. at 18.) Dr. Gardner did not conduct a cognitive screening exam to determine the extent of Miranda's cognitive impairment. (Tr. at 48-49.)

• In support of her finding that Miranda was "remarkably" or "pathologically" naïve, Dr. Gardner cited the following evidence:

    ○ Miranda said her criminal trial went well even though she had been convicted. (Tr. at 19.) However, Dr. Gardner later admitted that she was unaware that during that trial Miranda's lover was acquitted and she herself was acquitted on one count, so there may have been a legitimate reason for Miranda to believe the trial went well. (Tr. at 115.)

    ○ Miranda stated that "you have to be nice to everybody" and "everybody is good". (Tr. at 19.)

    ○ When Dr. Gardner went to the prison, Miranda at first refused to meet her because a guard had told her that the "lady who sees crazy people is here" and Miranda took that literally. (Tr. at 24.)

    ○ Dr. Gardner conducted a collateral interview with Norma Segura, Miranda's close friend, who told her that Miranda had left her child with a relative stranger and had asked Ms. Segura to bring an inmate's boyfriend to the prison on her next visit. (Tr. at 35.) To Dr. Gardner, these instances demonstrated that Miranda had difficulty understanding people's motives and an inability to see how circumstances could be potentially dangerous. (Tr. at 36.)

• Miranda's "extremely austere" childhood was also a factor according to Dr. Gardner, because without the normal exposure to life experiences, it was foreseeable Miranda would possess underdeveloped social skills. (Tr. at 20.) Dr. Gardner testified that this was reflected in Miranda's issues with men and her lack of a father figure. She concluded that Miranda's difficult upbringing likely led her to seek the attention from older men and to end up in bad relationships with men who easily manipulated her. (Tr. at 22, 56.) Miranda told Dr. Gardner that she left her home in Mexico at age 16 and moved to Chicago by herself where she got pregnant after being raped by an older male companion. (Tr. at 22.) After this incident, Miranda felt that she should marry the man. (Id.) She later found out that the man was married with children of his own, something that Ms. Segura realized about him right away. (Tr. at 128.)

• Dr. Gardner's diagnosis of "pathological naïvete" is not a scientifically recognized psychological classification in the DSM-IV. (Tr. at 27.) She did, however, state that there are some valid diagnostic categories, such as battered women's syndrome, that are not included in the DSM-IV. (Id.) Dr. Gardner's evaluations did not include a diagnosis of either a formal personality or thought disorder. (Tr. at 112.)

• Dr. Gardner did not seem to consider how Miranda's well-documented lies affected the reliability or interpretation of the MMPI-2 and the clinical interview. (Tr. at 40, 80.) On cross-examination Dr. Gardner admitted to the Government that she was unaware of the significant allegations surrounding the real identify of Miranda and whether the childhood

-5-

history that she represented to Dr. Gardner was accurate at all. (Tr. at 85-96.) She further admitted that she was not sure how much of what Miranda told her was true but felt these discrepancies did not have a "significant bearing" on her psychological conclusions. (Tr. at 97, 129.)

• The finding that Miranda had a psychological age equivalent to a twelve year old was based on inferences from the MMPI-2, which is not designed to measure psychological age, and Dr. Gardner did not administer an independent Wechsler Adult Intelligence Scale test that would have more accurately determined this age. (Tr. at 66.)

• Miranda had an elevated score on the paranoia scale of the MMPI-2, which rarely produces false positives, and this demonstrates that she is *more* suspicious than the average person and is somewhat mistrusting of individuals. (Tr. at 102-03.) Dr. Gardner testified that during the interview she got the impression that Miranda now feels she "got a raw deal," was being unjustly punished, and that she had been potentially set up by her friends. (Tr. at 103.)

• When presented with the choice between whether Miranda was "pathologically naïve" or "unduly suspicious and a liar," Dr. Gardner contradicted her earlier assertions (Tr. at 18.) and stated that "either extreme is not accurate," (Tr. at 124.).

**4.     DISCUSSION**

     a.     <u>New Trial Standard</u>

In order to grant a new trial based on newly discovered evidence, Defendant must show that: (1) the new evidence is material; (2) the defendant only became aware of the new evidence after the trial; (3) the defendant could not have discovered the evidence by due diligence any sooner; and (4) the evidence would probably lead to an acquittal in the event of a new trial. *United States v. Brumley*, 217 F.3d 905, 909 (7th Cir. 2000). The Seventh Circuit Court of Appeals began requiring that acquittal be "probable" after realizing that the previous "possible" standard was too nebulous; "[t]aken literally, any difference in evidence presented at a new trial, regardless of how whimsically one conjures a difference, 'might' result in a jury reaching a different conclusion." *United States v. Van Daal Wyk*, 840 F.2d 494, 500 (7th Cir. 1988) (considering an appeal for drug possession and conspiracy conviction and district court's denial

of new trial).  For this reason, courts apply a fairly rigorous standard and, as an initial inquiry, the Court should assess the proposed evidence to determine if it is "inherently credible and substantial enough to warrant a close review." *Coogan v. McCaughtry*, 958 F.2d 793, 801 (7th Cir. 1992) (considering a habeas petition).  There is no standard quantum of evidence that can be applied to every case to determine if a new trial should be granted because cases are evaluated on a fact specific basis and granted a new trial when the newly discovered evidence outweighs the evidence on the record against the defendant.  *See United States v. Goodwin*, 770 F.2d 631, 640 (7th Cir. 1985) (holding newly discovered evidence that may make a defendant's testimony or case *more* credible is not enough and must overcome other evidence to the contrary in order to serve as the basis of a new trial).

The Court, therefore, has significant discretion in its determination of whether Dr. Gardner's testimony is sufficient to warrant a new trial for Miranda.  *United States v. Gonzalez*, 93 F.3d 311, 315 (7th Cir. 1996) (holding that the decision whether to grant a new trial is within the discretion of the district court).  It is necessary for the Court to determine both if Dr. Gardner's testimony is admissible and credible and, if it is, whether her testimony would overcome the circumstantial evidence against Miranda on the record that led the jury to infer she deliberately avoided knowledge of the drug trafficking scheme.  The trial evidence against Miranda consisted of Diaz's testimony that Miranda explicitly knew of the group's plans to smuggle drugs, her close relationship with these men indicating a familiarity with their activities, and questionable circumstances such as their request for her to register the car they bought for her in her name and telling her they were traveling to Mexico to attend a party.

b.  Admissibility of Testimony

Pursuant to Fed. R. Evid. 104(a), this Court must make a preliminary assessment of whether proffered expert testimony is "scientifically valid" based on its underlying methodologies before allowing it into evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993). Several criteria factor into this test of reliability, including: (1) whether the technique or theory can be tested; (2) if it has been subjected to peer review or publication; (3) whether there are standards controlling the administration or operation of the technique; and (4) whether it has enjoyed widespread acceptance within its subset of the scientific community. *Id*. These factors do not constitute a "definitive checklist," nor are they all applicable in every case. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999); *United States v. Young*, 316 F.3d 649, 657 (7th Cir. 2002). The court's inquiry is flexible and it has "broad latitude" in determining whether the proposed testimony is admissible under these standards. *Kumho*, 526 U.S. at 141-42.

Credibility determinations are questions for the jury and the court should confine its determinations to questions of admissibility, not to the weight that the testimony will be given. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000). The inquiry should focus on the underlying methodologies and not on whether the court agrees with the expert's ultimate conclusions. *Daubert,* 509 U.S. at 580. When a court deems evidence admissible but questionable, the appropriate way of illuminating its deficiencies or implausibility is through cross-examination and presentation of contrary evidence by the opposing party. *Id.* at 596.

Often there are numerous tests, protocols or sources that an expert can use in developing her opinion, and the Seventh Circuit recognizes that reliability is not necessarily undermined by

an expert's choice among these accepted methods. *Cooper*, 211 F.3d at 1020. In particular, the fields of psychology and psychiatry pose special challenges because of their fluid nature, the fact that they deal with complexities of human behavior and are largely dependent on anecdotal evidence. *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). For these reasons, it can be difficult to determine if opinions are sufficiently grounded in scientific methodology. *Id*. The Seventh Circuit has recognized that compared with other sciences, in these fields "it may be more difficult at times to distinguish between testimony that reflects genuine expertise – a reliable body of genuine specialized knowledge – and something that is nothing more than fancy phrases for common sense." *Id*. It has even gone so far as to express a heightened sense of skepticism in regard to experts in these fields, stating that "[w]hile some courts may have blind faith in all phases of psychiatry, this court does not," and remarking that trial court records show a "marked propensity" of purported psychiatric experts tailoring their testimony to the particular clients. *Haas v. Abrahamson*, 910 F.2d 384, 391 (7th Cir. 1990).

It is notable that the Second Circuit Court of Appeals considered a case strikingly similar to the instant case and demonstrated their skepticism of psychiatric diagnoses that attempt to explain away or rationalize common behavior. *United States v. Bright*, 517 F.2d 584 (2d Cir. 1975). In that case the defendant was convicted on several counts of possession of stolen mail and based her defense on the assertion that she did not know the checks were stolen because she had a naïve belief that everything her boyfriend told her was true. *Id*. at 585. The defendant tried to introduce testimony from a psychiatrist who, although unwilling to say she was mentally ill, was prepared to testify that the defendant's "childlike character structure unconsciously 'needed' to believe that these men would never involve her in illegal activities," thus

demonstrating she was incapable of understanding her complicit participation in the illegal activities. *Id*. The Court held that the expert's testimony was inadmissible because it was merely a "fancy" way of saying that she was gullible and did not go to show that she lacked the capacity to form the specific criminal intent. *Id*. at 586.

Generally, if a psychiatrist bases her testimony not only on a patient's self-reported history but also on either additional tests, interviews, third party corroboration or interpretation guided by professional resources, then that is sufficient to meet the standard for admissibility. *See Walker*, 208 F.3d at 586 (holding that psychiatrist's testimony regarding party's pre-accident IQ was admissible when it was based on self-reported history in addition to information from interviews with family members and the administration of an adult reading test); *Young*, 316 F.3d at 658 (holding that psychologist's testimony about the effects of abuse on women was admissible when based on significant clinical studies of numerous victims, a review of the case evidence and an interview with the victim, even though the expert did not conduct corroborating interviews with the victim's family or friends). There is no uniform requirement of how many tests should be done or sources consulted in making a valid psychiatric diagnosis – since that will depend on the facts and circumstances of each case – and thus the court has wide discretion to determine admissibility.

Turning to the matter at hand, Gardner relied heavily on Miranda's self-reported personal history. While some of the facts provided by Miranda were probably true, other important information is inconsistent with the evidence. Gardner stated that none of the apparent discrepancies suggested by the government would significantly impact her psychological

conclusions. This is difficult to square with the heavy reliance Gardner placed on what Miranda told her.

The Government points out a number of different tests that Dr. Gardner could have used or sources that she could have consulted in arriving at her conclusions about Miranda. She conducted six hours of clinical interviews with Miranda, administered the MMPI-2, and claims to have interpreted it using recognized psychiatric guidebooks as well as her years of experience. While Gardner administered the MMPI-2 to Miranda, her testimony as to the extent that the obtained results confirmed her diagnosis is labored. Indeed, on cross-examination she retreated from some of her conclusions. Her description of her conclusions as a "mosaic" underscores the degree of subjectivity involved. Miranda fit none of the recognized categories of mental illness, and the objective tests upon which Gardner relied failed to support her conclusions. The fact is that there is a significant analytical gap between the facts and her opinions. Like the Second Circuit in *Bright*, Gardner's opinions amount to nothing more than lay conclusions, dressed up in technical language to overstate Gardner's belief that Miranda was gullible based on what Miranda told her. Although Gardner sought to buttress her opinions by stating that she also relied on her "experience," she failed to demonstrate what in her experience qualifed her to opine on the issue of naïvete. Therefore, this Court concludes that her testimony would not be admissible under *Daubert*.

  c.  <u>Appropriateness of the Ostrich Instruction</u>

Even if Gardner's testimony were admissible under *Daubert*, this Court would need to determine if it is a sufficient basis to grant a new trial. This inquiry is at odds with the objective *Daubert* test because, in order to decide if a new trial is warranted, this Court must necessarily

weigh Dr. Gardner's testimony to determine the likelihood that it would lead to an acquittal in the event a new trial was granted. This decision is complicated by the use of the ostrich instruction at trial, which makes the *mens rea* question that is essential to the conspiracy conviction harder to parse out.

The ostrich, or conscious avoidance, instruction is appropriate in cases where the defendant "claims a lack of guilty knowledge but there are facts and evidence that support an inference of deliberate ignorance." *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999). Typical cases that warrant the instruction include defendants claiming they were unaware of transporting drugs despite close ties to known drug dealers and circumstances imbued with questionable or suspect subtexts. *See, e.g.*, *United States McClellan*, 165 F.3d 535, 549 (7th Cir. 1999) (holding the instruction was appropriate when defendant claimed he simply did not know he was transporting two hundred pounds of marijuana across state lines despite his close association with known drug dealers); *United States v. Covarrubias*, 65 F.3d 1362, 1370 (7th Cir. 1995) (holding instruction appropriate when defendant "cut off her normal curiosity" and did not question when her boyfriend told her they were traveling to an amusement park in Texas but decided instead to go to Ohio to "pick fruit" before driving non-stop to Texas and back to Illinois).

The ostrich instruction does not equate to a theory of negligence liability, and is not based on what a reasonable person should have known in the same circumstances. *United States v. Giovanetti*, 919 F.2d 1223, 1228 (7th Cir. 1990). It is a subjective inquiry of what the particular defendant knew and whether that was sufficient to support an inference that she remained deliberately ignorant. *United States v. Carillo*, 435 F.3d 767, 781 (7th Cir. 2006).

This distinction is difficult to navigate, particularly in a case of psychological avoidance where a defendant may have simply been acting incuriously rather than consciously cutting off her curiosity to avoid the reality of illegal activities. *Carillo,* 435 F.3d at 780; *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir. 1988).

Because it is essentially impossible to prove actual knowledge unless the defendant admits to knowing of the conspiracy, the ostrich instruction allows the prosecution to demonstrate that "a charade of ignorance" is "circumstantial proof of knowledge." *Diaz*, 864 F.2d at 550 (stating that "[o]ne can in fact not know many detailed facts but still have enough knowledge to demonstrate consciousness of guilty conduct sufficient to satisfy the 'knowing' element of the crime"). The government can submit jury instructions for both actual knowledge and conscious avoidance in the same case where the issue is properly raised by the evidence. *United States v. Wilson*, 134 F.3d 855, 868 (7th Cir. 1998).

In the instant case, the ostrich instruction was appropriate because, while Miranda claimed no actual knowledge of the conspiracy, there was significant evidence of sufficiently suspect circumstances to allow a jury to infer that she willfully avoided confirmation of the drug trafficking. Even if a new trial were granted, the evidence supports giving the instruction. Dr. Gardner's testimony would not change the use of the instruction, but could have served to disprove that Miranda did not deliberately avoid knowing by offering a theory of why she was incapable of the necessary suspicions or curiosity to show deliberate avoidance.

## 5.  CONCLUSION

Dr. Gardner's opinion testimony is inadmissible under *Daubert*. The deficiencies in her factual assumptions, her testimony, the fact that she essentially withdrew her finding that

Miranda was pathologically naïve, and the numerous unanswered questions over the extent to which Miranda's dishonesty may have affected Dr. Gardner's opinions, all indicate that – even if admissible – her testimony would not have been given much weight by a jury. Her explanation of why Miranda was incapable of the requisite curiosity to defeat the ostrich instruction would not likely be credible or accepted, but instead would be seen as a "fancy" term sought to excuse relatively common human reactions. Therefore, Defendant's motion for a new trial is DENIED.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: September 24, 2007